Before we begin this morning, I have some sad news. Our colleague Judge Dan Freedman passed away last night. This is a severe blow to the court and to us personally. Judge Freedman is the last of the original members of this court. He joined this court when it was created in 1982. Before that, he had had a life of remarkable public service. Starting in 1942, he served in the Army as a member of the Greatest Generation in Europe. He served with the SEC for some years. He moved to the Department of Justice, where he worked his way through the Antitrust Division and ultimately became Principal Deputy Solicitor General, where he argued 80, 8-0, 80 cases before the United States Supreme Court. Those of you who made practice in the area of antitrust or securities law, if you go back through the cases that everybody knows about from the 50s, 60s, and 70s, you'll find very many of them will be argued by Daniel M. Freedman. After that, President Carter appointed him Chief Judge on this court and remained so until the day that he died. He put in 70 years of public service, which is an extraordinary record in and of itself. But beyond that was a man, a really extraordinary man I knew well. He hired me into my first job in the government, and I worked directly under him and then was privileged to work with him on this court. He was a gentle man and a gentleman. He was a very clear thinker, a very clear writer, and I remember my first day on this court, he told me that a rule that I probably have not observed as often as I should, but in writing opinions, that the objective was to tell them what you decided, to tell them why, and then stop. And he was exceptionally good at that. You didn't need a table of contents to find your way around a Dan Freedman opinion. He will be sorely missed, and if we could, I'd like to observe a moment of silence in his memory. Thank you. The day has further consequences for this court, which is a happier event which is this is the first day in which we are sitting in the renovated courtroom 203. It's been completely redone, but the original furnishings are still here and perhaps something that is indicative of the continuity of the court. These are the furnishings that were originally in the would have felt very comfortable with when he started in the Court of Claims. So welcome all to the first day in our new court. The first case on for argument today is number 11109 for Alec, I'm sorry, 1110, 1160, Fuzzy Sharp against 3D Labs. Mr. McAndrews. Good morning, Your Honors. Counsel. I know I speak on behalf of my colleagues here, certainly on behalf of my family and my partners back in Chicago in extending our condolences to Judge Freedman's family, his loved ones, and the courts. Thank you. He certainly left a lasting legacy though. Turning to our case, the district court at the time of its ruling in December 2009, of course, did not have the benefit of the Supreme Court. The Supreme Court categorically invalidated the five asserted claims of Fuzzy Sharp's 679 and 047 patents, finding them to be unpatentable under Section 101 of the Patent Act. In doing so, the court solely and exclusively applied the Machina Transformation Test in its Section 101 analysis. The first point I would make, and the obvious point that we briefed, is that in not having the benefit of the Supreme Court's Bilski decision, the court erred in its application of the 101 analysis. The Supreme Court very clearly said, and this court has subsequently acknowledged in at least several opinions, that the Machina Transformation Test can be a useful tool. It cannot be used as a sole or exclusive means of applying a 101 analysis, and that's exactly what happened in the district court's analysis en route to invalidating the five asserted claims. The Supreme Court talked about the Machina Transformation Test as being a significant clue, a good starting point, basically saying it can't be dispositive, but it should be an important consideration. Why don't you tell us how you view the Machina Transformation Test in this respect? What happens after, analytically, what happens after the Machina Transformation Test is applied and the claims are found wanting under that test? What's the right approach for the court to follow? I would say two things, Judge Bryson. As an initial matter, I do believe the Machina Transformation Test is an important inquiry, a useful tool, as the court has said. The second part of my analysis, I would address how I see these five asserted claims at least coming out under that test, coming through in the wash under the Machina Transformation Test. I still think these claims pass muster, if that answers your question. Under the Machina Transformation Test, or? Under the Machina Transformation Test, yeah, that's right. But going to Judge Bryson's question, I mean, there have been a lot of different approaches post-Bilkey. Some district courts have said, well, you always start with Machina Transformation Test, and then you see if maybe there's something that saves it after the fact. Research Corp. seems to do a different approach. What are you arguing is the best approach that we should do post-Bilkey? Well, I certainly think that the analysis in Research Corporation serves our argument well. I also happen to think that it was a coherent interpretation of Section 101. I don't know that it's at odds with the Machina Transformation Test. One of the concerns that I would have in a rigid application of the Machina Transformation Test is the old language that it has to be tied, the invention has to be tied to a particular machine. I think one of the things that came out of the Research Corporation opinion was an analysis and discussion of the notion that software in many contexts is and should be patentable. In our case, I don't think we're just talking about a general purpose computer. I think we're very specifically, even in the context, the four corners of the claim language itself, I think we're talking about a special kind of computing, 3D graphics computing. How do you respond to your opponent's argument that really Research Corp. was a classic transformation case? Well, as we point out in our reply brief, Judge, there's no analysis of transformation in the case. I think that had that been a critical factor, the Court would have addressed it. And notwithstanding, I think the remainder of the analysis in Research Corporation is very rich and useful in application to the facts before us today. Let me go back to my original question, if I could. Let's assume that we conclude that your claims do not pass the Machina Transformation Test. That is to say that the machine, to the extent that it's asserted here, is not a sufficiently concrete form of machine, not a sufficiently particularized computer to satisfy the test. What is the analytically, what's the right approach after that? If you determine we're making that assumption, are you telling me that? Right, sure, sure. That's my, I'm going to ask you to address the, start with the assumption that we have concluded the Machina Transformation Test is not satisfied. Your Honor, I would say what we would do in that case is take two steps back and start again with Section 101. The broad and categorical definition of what is patentable under the Patent Act. I'd look at the definition under 100, Section 100B, and I think clearly under those circumstances, and again, borrowing from some of the analysis in Research Corporation, there is nothing that categorically or statutorily precludes these claims, particularly these five claims that recite structure. They talk about computing, 3D graphics processing, specific to computer hardware, but there's nothing that precludes these claims from patent eligibility under the Act. So that's what I would say. What's the criteria you would use under Research Corporation to get to that result you just articulated? I think I would, I'd use exactly the result I, or analysis that I just recited, Your Honor. I would start with Section 101 and then the specific definition under Section 100B. I found the analysis in Research Corporation to be refreshing in that regard. It started in the broadest sense. It said unless you have exceptions to this, there's no reason that you don't have claims subject matter under the Patent Act. But Research Corporation pointed to some very tangible hardware elements when it was discussing whether or not the claims had a tangible attachment. I mean, they talked about the high contrast film, they talked about a variety of other things. You just keep referring to a general process computer in your claims. Isn't there a distinction between your claims and those in Research Corp? I think you'll see some of the sections, and I apologize, Judge O'Malley, I don't have them by road memory, but I did discuss them in our briefing in the specification, the claims, where we do talk about unique aspects of a computer. Z-axis buffering or Z-buffering. That's a particular way of doing things in memory. Well, there's certainly a lot of detail in the specification. The question, though, is does that detail make its way into the asserted claims? You can have an elaborate description of a submarine, for example, in your specification, and if you claim the idea that it would be nice to have boats underwater, and that's your claim, you probably don't get a patent for it, right? It's just an abstract idea. I agree with that, Judge Bryson. I think, and I gave a few examples of dependent claims and, in fact, asserted dependent claims, where we lay out, which is not uncommon at all, of course, we lay out additional clarity in terms of what hardware we're talking about. I would also note the two opinions of this Court, where there wasn't any hardware per se, recited in the claims themselves. Here, I don't think there's any dispute that we do recite hardware. We recite computer hardware, and we even go on to talk about some of the unique aspects of how the memory functions specific to the claim systems of the asserted claims. But in the two cases to which I'm referring, this Court found enough, by way of explanation in the specification, to construe the claims themselves as being specifically directed to computer hardware. In Research Corp, the panel looked to unasserted claims. Should we be looking to unasserted claims? I think so. What is before this Court right now is a threshold inquiry. We are not at the stage of claim construction yet. I would say, in many respects, that's a claim construction issue. We don't know how the District Court might construe these claims. Did you ask the Court to do claim construction first? Claim construction was done, but I think on the particular... I took over, Your Honor, midstream in this. I think that goes a little bit to claim construction. I don't think it would be improper at all. And claim construction is the reason I would say that. Quite frequently, we look at many other claims, asserted and non-asserted, in construing what exactly is meant by the language of an asserted claim or a claim. Yes, if that's part of claim construction. But if what you're suggesting is, and if you read Research Corp to me, that as long as some claims assert 101 subject matter, that all claims have to be regarded as passing 101, that would seem to result in a different answer to the submarine case. And I'm not suggesting that. You're not suggesting that? Not at all, Judge, not at all. I think within the four corners of the five asserted claims, we have patentable subject matter. I'll reserve the remainder of my time. Very well. That's all right. Thank you. For your opposing counsel. Mr. Baker. May it please the Court. The claims at issue in this appeal are invalid under Section 101 for at least four separate reasons. First, the claims at issue on their face are directed to an abstract idea. Second, the claims would substantially preempt all practical applications of the claims abstract idea. Third, the claims do not satisfy the machine or transformation test. And fourth, the claims do not satisfy the Supreme Court's analysis of patentability in the Benson, Fluke, and Deere cases. Let me start with the first of those reasons, that the claims themselves on their face are directed to an abstract idea. And that's apparent just by looking at the claims. The claims on their face indicate that they are directed at a method for reducing the complexity of visibility calculations. What's your definition that you're using for abstract idea? Well, I'm not sure I'm providing an exact definition for it. But rather, by looking at the claims and the specificity with which they describe what they're claiming, it's apparent that the claims here are talking about abstract ideas. I mean, your case got a lot more difficult as time went on. Because you were under the machine or transformation test. Now you've got Filski, and now you've got Research Corp. And Research Corp says that abstract ideas are only to be found in the most rare of circumstances, essentially. Do you think you satisfy that criteria? Uh, yes. I think we satisfy the test even under RCT. I think the case did get a little harder because of RCT. The Filski Supreme Court decision, I don't think really detracts from the analysis of the district court here. Because they indicated in the Supreme Court that machine or transformation test remains a useful and important clue to patentability in process claims. And the concurrence indicated that the judges all agreed that it was reliable in most cases to determine the patentability of process claims. But we really have to look at Research Corp. Because absent an en banc, we're bound by Research Corp. Yes. Research Corp is an interpretation of what Filski means in this kind of context. So I think you need to focus there and tell us why this is different. Yes, I'm happy to do that, Your Honor. In the context of RCT, it's important to recognize that RCT itself said it was not setting forth a definition or explanation of what abstract meant. In other words, it was just applying the precedent to the facts of that case to determine whether in that case those particular claims were abstract or not. And the claims in RCT are quite different in at least two respects from the claims at issue here. The first way that they're different is because the claims refer to rendering a halftone image In other words, they produced a real-world output. And thus, they performed a transformation. And the patent that was at issue in that case actually confirms that. Because if you look at the 310 patent, which is the patent that was at issue in the RCT case, in column 3159, it talks about the fact that the halftone image is what is displayed. It says the binary image array is then converted to a binary display, which is the resultant halftone image. So in other words, the product of the claim, the halftone image, is something that's displayed. And thus, there's a transformation, Your Honor. In contrast, the fuzzy sharp claims do not produce any real-world output. And thus, they do not perform any transformation. They just manipulate abstract data internally inside of the general purpose computer. Does that manipulation result in different images and a different processing of those images? The claim doesn't talk at all about how the images are processed. It just talks about taking some of the data and determining visibility. It doesn't actually talk about how the images are generated. It doesn't talk about how the visibility calculation is performed. It doesn't talk about how the initial assessment of visibility is performed. So it's just claiming a generic algorithm. In other words, the generic idea of reducing the complexity of visibility calculations by doing an initial assessment of some visibility relationships. So it's entirely lacking detail about how those individual steps are performed. Well, there certainly would seem to be a patentable concept, even a patentable implementation, if you could, for example, come up with a method for simplifying what otherwise would have been a very complex computer operation. If you could make a processing of, say, word processing program much more efficient so that the same program could be run on a much slower computer with the same degree of efficiency, that would be an invention of some value and no doubt patentable. Wouldn't you agree? Yes, I'd agree, Your Honor. Even though it might be merely the concept of, say, ignoring certain essentially immaterial or at least marginally material facts that the computer under the previous system was required to pay attention to, right? Yes, but I think it's important to recognize that the claim in that case would have to be drafted in a way such that it was transforming some data, that it had some real-world input or real-world output, or that it was tied to some particular machine. Well, it's tied to a word processor, but the only transformation is that it is proposing to ignore certain calculations that it ultimately, that the creator of the idea has decided really aren't that important, and therefore you can make this whole thing work a lot faster and a lot more efficiently by ignoring certain things, which don't end up really mattering to the user. That would be a good invention, don't you think? Well, I think in order for it to be a patentable subject matter in accordance with Supreme Court decisions in Benson, Fluke, and Deere, you would want to draft the claim such that it referred to some user input, the user entering some information into the word processing program, or the word processing program displaying the results on the screen. And you can incorporate the improved algorithm in the context of an otherwise patentable process, which is exactly what was the case in Deere, in the Supreme Court's Deere case. Wouldn't those type of claims be better treated under Section 112? Well, I think there's also an issue under Section 112. You'd have to look to see if the claim had appropriate written description support. But I view that as a further requirement for patentability that you would get to after you make an initial determination about whether the patent is directed under 101, a patentable subject matter. Are you saying that if there was a displaying step, that that would be enough? I think that would make a huge difference in terms of patentability. Claim one in Research Corp didn't have a displaying step, did it? Well, I think it did, Your Honor. In referring to rendering a halftone image, if you look at the patent in that case, the halftone image itself is what is displayed. And so in our view in that case, it was creating an image for display. That is the halftone image. In other words, the result of that claim. Even though it wasn't claimed, you're saying essentially that's what it has to have been? Well, I'm saying that the very claim itself, when it says a method of producing a halftone image, that producing a halftone image inherently involves a display step. That is my understanding of that. So you're saying a display by implication? Is that what you're saying? I think it's inherent in the phrase halftone image that it's displaying. We're at a minimum, Your Honor. It's producing an image that's immediately ready for output display. It's either actually displaying it inherently, or it's producing an image that's immediately ready for display. And that's in contrast to the claims here, where they don't even talk about in the steps of the claim, preparing an image for display. After you're done with all the steps of the claims, all you need to complete are visibility computations. You still have no image that's ready for display, let alone actually being displayed. Well, we're talking about 3D graphics, aren't we? Some of the claims do refer to 3D graphics, Your Honor. But in our view, that is just a field of use limitation, like the ones that are at issue in the Benson, Fluke, and Deere cases. When you say preparing for display, well, that's all just computing, right? I mean, if you have everything set up so that it can be sent to the screen, and the screen will respond by giving you a display, you've just manipulated data up to that point. And yet, you're suggesting that that form of manipulating data, as long as it's screen ready, so to speak, does constitute a sufficient transformation to satisfy the machinery transformation test. Is that your point with regard to that? Well, I think it's much more clear in earlier federal circuit cases, like the Inmate Belly case, where there's actually a display of information. Right, but we were talking about not requiring an actual display, but having the computer process data and be ready to provide a display, and that you were saying that's enough. Well, in my view, the RCT case is probably understood as actually having a displayed image, because in my view, from looking at the patent and how it uses the term a halftone image, that's something that is actually displayed, that the claim to issue an RCT actually involved a transformation and a display, even though there's no explicit step saying, you know, displaying a halftone image. Just the preamble itself indicates that it's displayed. That is my understanding of RCT. But where does Research Corporation mention transformation specifically? It doesn't specifically talk about transformation, but it refers to the process of rendering a halftone image as being the type of process that the patent law is designed to protect, and that's because it is a process just like the process in DEER, where you're actually doing a transformation and actually having a real world impact. Are you saying that Research Corp requires a transformation? I think that is the most appropriate way to understand Research Corp and to harmonize it with the earlier cases, including the Bilsey decision. This whole debate about what the patent does or doesn't do takes me back to this question of claim construction. Despite Mr. McAndrew's statement, there wasn't really a claim construction in this matter, was there? That's correct, Your Honor. The claim construction had been briefed, but had not been decided at the time of the summary judgment decision. But in its opposition to the summary judgment, Fote-Sharpe did not raise any issues of claim construction that required resolution in order to be able to resolve the summary judgment motion. But really, for purposes of appropriate review, while I can understand that there will be circumstances where no claim construction is necessary to decide whether one or one is satisfied, like if you claim a way to teach ballet or something, in a case like this, wouldn't we be better off if the court had construed the claim so we're not sitting there debating what the patent does or doesn't do, so we know what the claims say in deciding whether they claim patentable subject matter? In this case, I don't think it actually matters, because under no conceivable construction could I see these claims being patentable, because at best, all the staff's just referred to internal manipulations of data, and they're not tied to any particular machine, they're not tied to any particular transformation. And the parties had put forth their proposed constructions and their agreed constructions at the time of the summary judgment decision, and there's nothing in there that would have altered the outcome. So I can imagine some cases where a claim construction could have an impact on the one-to-one determination. I just don't think that applies to this case. What do you do with Judge Rader's language in research court about specific applications of or improvements to technologies in the marketplace? Isn't this an application of technology in the marketplace? I don't think it's a specific application, because the claims just talk about 3D graphics in general. They're not tied to a particular visibility computation, they're not tied or limited to a particular use of the visibility computations in 3D graphics. Isn't tying it to 3D graphics a reasonably specific application? Anything narrower than that would seem to me to be perhaps narrower than the invention's actual utility on the ground. I mean, you're not going to want to limit it to certain types like cartoons or something like that. It would apply to all 3D graphics, right? Well, I think the same thing would apply in the Supreme Court's Benson case where the court came out and said that the claims were not patentable. You had a method for converting BCD... Right, but that applied to all computing. As if the Supreme Court, if that claim had been the converting data for purposes of word processing, again, to use that example, it would seem to me that would be a sufficiently narrow application that at least that patent wouldn't fail because of lack of specificity of use, right? Even though there are different types of word processing programs, but to the extent that the invention would be pertinent to them all, you could claim them all, right? Well, I think that the more specific field of use, potentially, the more patentable it is. But the same thing applies to the Fluke decision where the claims were related to catalytic conversion process. And the court said that a mere field of use limitation is not sufficient to give sufficient specificity to the claims to make them not abstract. And the same thing applies here. Which says something which is at least in some tension with... Right, and actually, that gets to the second point that I wanted to make about how this case is different from RCT because it's... Before you go there, counsel, I want to go back to something that Judge O'Malley raised. And that's the precedent that research corporations set. And Judge Rader, another criteria that he set out in that opinion was the question of whether the invention presents a functionable and palpable application in the field of computer technology, number one, and whether it addresses a need in the art. Doesn't advanced 3D technology address a field in the art? And isn't this a functional application in the field of computer technology? Your Honor, I think that... I think there's kind of two responses to that. First of all, I don't think we can read the RCT decision in a way that conflicts with the Supreme Court precedent. So to the extent that that language is intending to resurrect the useful, palpable useful and result test of state treatment in other cases, that can't really be what it means. Moreover, even applying that test, it's not clear that the claims here are really either functional or palpable because they're not tied to a specific, particular visibility computation or particular method of doing the initial assessment. And it relates just to the internal manipulations without any type of output to the real world. So it's hard to describe that as really functional or palpable. Mr. Baker, you were going to raise one other point with respect to Research Corp. Why don't you make that, if you could, very, very briefly. I think I can, Your Honor. Thank you. So the second way in which the current case differs from RCT is that in RCT, the claims as a whole were directed to a penanceable process of producing a halftone image, even ignoring the algorithm that was used for the blue noise mask. And that's very similar to the Deere case, which involved the process for curing synthetic rubber. And the Arrhenius equation in that case was just used in one or two of the steps of the process of an otherwise penanceable process for curing synthetic rubber. In contrast, in the Fuzzy Shark case, the claims themselves are directed at, if you look at the claims in the preamble, it says reducing the complexity of visibility calculations. And that is an abstract concept and not an otherwise penanceable process. And so the claims here are distinguishable both from RCT and from Deere based on what the overall claim itself is directed at. Thank you. Thank you, Your Honor. Mr. McAndrews, you have several minutes of rebuttal if you need it. Thank you, Your Honor. I don't want to oversimplify or mischaracterize my colleague's argument. But it sounds as though one of the arguments is that if we simply attach a printer or a monitor or a flat panel, that somehow we can render something that is not patentable under 101 patent. I disagree with that. I wonder, though, if your argument isn't that if we attach a computer to an otherwise non-qualifying subject matter, that that would be enough to make it patentable. I don't think so, Judge Bryson. Picking up on the example you used with the word processor, if I have a process that renders a new font within the Microsoft word processor application, but I'm not connected to a display, but I hit the essential command keys to render this new and creative and wonderful font, something has happened internally. And I would submit under the standard articulated by the Supreme Court, by this court en banc in research, that that is patentable subject matter. And I think it's very akin to the- Research wasn't en banc. Forgive me. I'm sorry. Research was not an en banc decision. Oh, I'm sorry. I misjotted my note down as I was listening. No, I said in the absence of an en banc, we are bound by it. I think that that example, the example of the word processor, is very akin to what we're talking about here. And perhaps in the case- So you could patent a font? Is that what you said? That isn't what I'm suggesting. I'm suggesting the process for rendering that new font. There's something going on internally. It's more than simply mathematical. Otherwise, the result is that we simply conclude once and finally, that any software processes are necessarily algorithmic, they're necessarily mathematical, and therefore they're not subject to patent protection under 101. Or the definition. They don't meet the criteria for patentability under section 101. If we agree with you and send this back, are we just going to be seeing you again under 102, 103, 112? I mean, does this patent survive otherwise? I think it very much does. We're certainly not at the infringement stage, but that's where the goodies are here. We're using the example of the word processor. I will tell you this, in watching my four daughters and their friends play these video games, the Sony PlayStation. I mean, any process that can significantly short circuit the calculations required when you're doing a visibility calculation of whether or not you see my knees or my thighs here, because there's a podium in the way, that's absolutely new, useful, and non-obvious. It's universally used in the marketplace. And that goes to the point made by Judge Rader and Research Corporation. This is, and these claimed inventions are specific applications and improvements to technologies in the marketplace. I've seen it, Sony PlayStation and all the rest of them. Well, I just wonder, even if all of that is correct, and I'm looking now at claim one of the 047, which is, to my eye, pretty broad. And there, it really seems that you have not so much a method as a proposed approach to a problem. The approach being, in essence, to say, look for things that don't change, either because they're not always visible or because they're not visible, and disregard them. That seems to me to be at a level of abstraction that is just about as high as saying, don't do work that isn't necessary for the computer to do. I think, to Judge O'Malley's point, that that is precisely one of the reasons why this ought to be remanded for a claim construction, in light of this very exhaustive and detailed specification. So you think that claim construction might result in a limiting construction of this language, at minimum, to make clear that it's more limited than my characterization? You wouldn't agree with my characterization, I take it. Well, I don't want to limit it too much. We still have an infringement on that. But you probably are not going to embrace my characterization, right? No, but I would agree that the claim, and through claim construction, we're going to breathe life into many of these terms, that perhaps, to the extent, Judge Bryson, that you'd be satisfied with. OK. That raises another point, which I know we're done here, but please go ahead. Isn't, the other problem is, everybody's sweeping these all together. I mean, these claims are not the same. So just because one might be insufficiently specific to be abstract, doesn't necessarily mean another is. But why doesn't anyone differentiate between the claims? Well, I think the claims are- It's two different patents. It is different. I think the high point that I wanted to hit, Your Honor, was that with respect to each of the five asserted claims, you do have the specific recitation of hardware in there. And even beyond that, as we set out, hopefully, with relative detail in our briefs, I think you're falling within the, squarely within the amendment of 101. Very well. Thank you. Thank you, Mr. Grimes. Andreas, Mr. Baker, we thank both counsel. Thank you. The case is submitted.